| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF HAWAII |

| | | | |
|---|---|---|---|
| 3 | UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 03-00586DAE |
| | | ) | |
| 4 | Plaintiff, | ) | Honolulu, Hawaii |
| | | ) | April 7, 2006 |
| 5 | vs. | ) | 9:04 a.m. |
| | | ) | |
| 6 | CHARLES H. KOSI, JR., | ) | MOTION TO WITHDRAW PLEA |
| | | ) | OF GUILTY |
| 7 | Defendant. | ) | |
| | | ) | |
| 8 | | | |

```
8
                    TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE DAVID ALAN EZRA,
               UNITED STATES DISTRICT JUDGE
10
      APPEARANCES:
11
      For the Government:        WES REBER PORTER, Esq.
12                               Assistant U.S. Attorney
                                 District of Hawaii
13                               Room 6100 - PJKK Federal Bldg.
                                 300 Ala Moana Blvd.
14                               Honolulu, Hawaii 96813

15    For the Defendant:         MARK R. ZENGER, Esq.
                                 Richards & Zenger, A Law Corp.
16                               P.O. Box 3966
                                 Lihue, Hawaii 96766
17

18

19

20    Official Court Reporter:   Cynthia Fazio, RMR, CRR
                                 United States District Court
21                               P.O. Box 50131
                                 Honolulu, Hawaii 96850
22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

**EXHIBIT H**

1                              I N D E X

2    DEFENDANT'S WITNESSES:                            Page No.

3

4    CHARLES H. KOSI, JR.

5      DIRECT EXAMINATION BY MR. ZENGER...............    4

6      CROSS-EXAMINATION BY MR. PORTER................    11

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    FRIDAY, APRIL 7, 2006                        9:04 A.M.

2              THE CLERK:  Criminal Number 03-00586DAE, United States

3    of America versus Charles H. Kosi, Jr.

4              This hearing has been called for a Motion to Withdraw

5    Plea of Guilty.

6              Counsel, your appearances, please?

7              MR. PORTER:  Good morning, Your Honor.  Wes Porter on

8    behalf of the United States.  With me at counsel's table,

9    Special Agent Gery Graham from ATF.

10             THE COURT:  Okay.  Good morning.

11             MR. ZENGER:  Good morning, Your Honor.  Mark Zenger on

12    behalf of Charles Kosi, who is also present, Your Honor.

13             THE COURT:  All right.  Good morning.

14             All right.  You ready to proceed?

15             MR. ZENGER:  Yes, Your Honor.

16             THE COURT:  All right.

17             MR. ZENGER:  Your Honor, we filed the motion and I --

18    the burden is on us to -- to present evidence sufficient.  So I

19    guess we'll call the defendant to the stand.

20             THE COURT:  Okay.

21                  CHARLES H. KOSI, JR.,

22    the Defendant herein, called as a witness on his own behalf,

23    having been first duly sworn, was examined and testified as

24    follows:

25             THE CLERK:  Please be seated.

4

1          State your name for the record and spell both your

2     first and your last name.

3          THE WITNESS:  Charles Kosi, C-H-A-R-L-E-S, K-O-S-I.

4          MR. ZENGER:  Your Honor, would the court prefer me to

5     question from here or from the lectern?

6          THE COURT:  It doesn't matter.

7          MR. ZENGER:  Okay.

8                    <u>DIRECT EXAMINATION</u>

9     BY MR. ZENGER:

10    Q    Mr. Kosi, where are you currently residing?

11    A    In FDC.

12    Q    Okay.  And how long have you been there?

13    A    For about almost two-and-a-half years.

14    Q    Now, do you recall the facts and circumstances that led up

15    to your arrest and indictment in this case?

16    A    Yes, I do, sir.

17    Q    And without getting into the actual details of what the

18    indictment says, do you recall that you -- the court appointed

19    you some attorneys?

20    A    Yes, I was.

21    Q    Do you remember the first attorney's name?

22    A    William Domingo, I believe.  Yeah.

23    Q    And did you have consultations with Mr. Domingo about how

24    to handle your case?

25    A    Yes, I had.

1    Q    During the course of your discussions with Mr. Domingo,
2    did you tell him that you thought that the stop that led to the
3    seizure in this case was unconstitutional?
4    A    Yes.
5    Q    And did you give him any instructions with respect to what
6    to do to that?
7    A    Yes, I did.
8    Q    What did you tell him?
9    A    That I would like to take my case to -- to suppress the
10   evidence and stuff because it was an unlawful stop.
11   Q    Did he do that?
12   A    No.  So, we got into this verbal thing and I said well,
13   hey, I can't work with you.  So I got another attorney.
14   Q    Okay.  Who was your second attorney?
15   A    I believe it was a Michael Heely, I think.  And then the
16   same kind of thing happened.  But it was worse with him because
17   he was kind of aggressive and I couldn't even talk.  And so we
18   got into this thing that we just -- he'd argue with me all the
19   time.  So, I ended up coming back to court and I got another
20   attorney and --
21   Q    Okay.  Who was the third attorney?
22   A    Alvin Nishimura, who seemed like a pretty good guy and
23   he's -- you know, I have nothing bad against him, but he did
24   some stuff with my case that benefit it, and then stuff at the
25   end that didn't benefit it because the whole time I wanted to

1    take it to -- the suppression because I knew I didn't have a

2    trial case.  My case wasn't a trial case at all and I knew

3    that.  So I said okay, I want to try and get these guys at the

4    suppression.  So I gave him all the work I could possibly come

5    up with and I did everything I could probably have done in that

6    little library and I came up with a decent case, case law and

7    a -- you know, to present for a suppression.  And I thought I

8    was going to win, but then I lost.  And so I was -- I was --

9    Q    Let me ask you a question.  Was that -- your suppression

10   hearing litigated with Mr. Porter and in front of Judge Ezra?

11   A    Yes, it was matter -- yeah.

12   Q    And you received a denial of that -- an order denying that

13   motion; is that correct?

14   A    Yeah.  It's about 6 weeks after that, that day.

15   Q    All right.

16   A    And so I told him I wanted to, like, appeal my case.

17   Q    Told who?

18   A    To Alvin, that I wanted to appeal my case.  And so he said

19   that I'm going to lose my appeal, I'm going to lose my appeal

20   because it's Judge Ezra and this and that and because of these

21   things he was telling me.  And I said:  But I have an appeal

22   case, you know what I mean.  I supposed to have won this

23   appeal -- this motion actually.  So I really felt confident

24   that I had an appeal case and I always wanted to take it to the

25   appeals court.  I didn't have a trial court, so I wanted to

1    plead guilty, get it over with and then go to the next step.

2    And so I said: Well, Latino, he -- he recommended working out

3    a deal. And I said okay, that'll benefit me. So I asked him

4    where was I in my -- my -- the chart thing, the category and

5    the levels and stuff.

6    Q    You talking about the United States Sentencing Guidelines

7    chart?

8    A    Yes. Yeah. And he didn't even know. He told me I was at

9    25. And I said okay, because I plead out early, what happens

10   next? He goes: You probably drop two levels to 20 -- twenty

11   something. And so he never did go over that stuff with me, it

12   was just verbally telling me all this. And so he said this and

13   that, so he said he got a -- he's got a plea agreement with

14   Mr. Wes Porter, and I was like: Okay. I can live with

15   doing -- doing 8 years I guess, you know, I did two-and-a-half

16   years down. I can live with that. And then I want to -- I'm

17   still going to appeal my case if -- if anything else.

18          And so we worked up this thing and he said he's

19   got the -- the plea agreement. And I swear to God, he told me

20   he had the plea agreement, he's going to bring it to me, he's

21   going to send it to me. He never did. For -- for weeks and

22   weeks and weeks, all the way up to the day that I got to this

23   courtroom.

24   Q    Is that April 5th, 2005?

25   A    April 5th, the morning. And I -- under oath, he never

1    showed me the plea agreement until 10 minutes 'til I came into

2    the other courtroom and stood there and then he said:  Okay,

3    this is the plea agreement.  That's the only time I touched it,

4    was that day, that morning.

5            And then he -- and I was scared.  I was, like, okay,

6    yeah, yeah, yeah.  So I said "yeah" to -- I could have said

7    "yeah" to whatever, you know.  But I did say "yeah," and I'm

8    not going to lie on -- I was on -- you know, I'm under oath and

9    what I said on record that day can cause me perjury.  So I'm

10   going to say that I did say "yeah" to a lot of things, but I

11   did not understand everything.

12   Q    Let me go back.  When you say the court and you said yes,

13   are you talking about your sentencing hearing in front of

14   Judge Magistrate Barry Kurren?

15   A    Yeah.  Yes, I am.

16   Q    All right.

17   A    And so basically --

18   Q    I'm sorry, change of plea hearing.

19   A    Yeah.

20   Q    Excuse me.  I'm sorry, Your Honor.

21           THE COURT:  Plea colloquy.

22           MR. ZENGER:  Yes.

23           THE WITNESS:  Didn't get sentenced yet.

24           So, you know, I mean, I don't want to get perj'd, I'm

25   not trying to stall the court's time.  I just wanted to plead

1    guilty and reserve my rights to appeal.

2          That's the only time I saw the plea agreement was

3    10 minutes before coming into that -- the court that day.  And

4    yes, I did sign it and yes, I said a lot of stuff, but I took

5    a -- I took some bad advice and I regret that.

6          MR. ZENGER:  Your Honor, just to make the record

7    complete, would it be all right with the court if I approach

8    the witness and show him the Memorandum of Plea Agreement?

9          THE COURT:  Sure.

10          MR. ZENGER:  It's actually Exhibit A to the opposition

11    in this case, the opposition to this motion.

12    BY MR. ZENGER:

13    Q    Mr. Kosi, I'm showing you Exhibit A to the United States'

14    Opposition to Defendant Charles H. Kosi, Jr.'s Motion to

15    Withdraw Guilty Plea entered on April 5th, 2005.  Can you just

16    take a moment to look at it.

17          Did you review it before court today since I've been

18    retained as your counsel and -- between the time of my

19    retention and the hearing today?

20    A    If I went through this -- this --

21    Q    Yeah.

22    A    -- this plea agreement?  Yeah.

23    Q    Okay.  Is that the plea agreement that you're saying that

24    you are now claiming you didn't have sufficient time to review

25    prior to going into the colloquy hearing -- excuse me, change

1    of plea hearing with Judge Magistrate Barry Kurren?

2    A    Yes, it is.  Like -- like I said, I saw the plea

3    agreement, and Alvin going have to say the same thing because

4    that's the truth, I saw the plea agreement 10 minutes before

5    signing -- going into that stuff and I asked him, I even wrote

6    him prior to that date, April 5th, a couple times asking him

7    for a copy of that plea agreement so I could review it and know

8    what I was getting myself into.  He never sent me a copy, never

9    showed me the copy until that morning.

10    Q    While you were writing these letters did you still have in

11    your mind that you wanted to appeal Judge Ezra's adverse ruling

12    on the Motion to Suppress to the Ninth Circuit Court of

13    Appeals?

14    A    With all due respect to Judge Ezra, yes.  Yeah.

15    Q    At any time during the time when Mr. Nishimura was talking

16    to you, did he ever mention the phrase "conditional plea

17    agreement" to you?

18    A    No.

19    Q    And have you heard that before today?

20    A    I heard it a little while ago from -- from you, that's it,

21    I never heard it before today.

22    Q    And is it your position today that you are willing to

23    enter into a conditional plea agreement?

24    A    I'm not trying to start up cases -- the case, I just want

25    to plead guilty and reserve my rights to appeal and get this

1    over with.  That's all I want, yeah.

2             MR. ZENGER:  I have no further questions of this

3    witness, Your Honor.

4             THE COURT:  All right, any cross-examination?

5                       CROSS-EXAMINATION

6    BY MR. PORTER:

7    Q    Morning, Mr. Kosi.

8    A    Morning, Mr. Wes Porter.

9    Q    Did you have an opportunity to look at the government's

10   motion in -- the opposition, did you read that?

11   A    This -- the one that --

12   Q    That's in front of you?

13   A    Yeah.

14   Q    Did you also see attached to that opposition the

15   declaration from Mr. Nishimura, your previous attorney?

16   A    Yeah, I read his declaration.

17   Q    Okay.  And do you recall reading in there that he says

18   that he went over the plea agreement with you and that you

19   understood the provisions?

20   A    I read that part.  Going over it with me was 10 minutes

21   before going in, through the mesh wire fence, that's what he

22   told me, he said:  Well, I got the plea agreement right here

23   and basically what you're going to do is this, this and that.

24   It's, you know, stuff and we're going to sign this and we'll be

25   out of there.  And that's what happened.  I never possessed it

1    or touched it or really went over it.  He just showed me the

2    stuff through the mesh wire fence.

3    Q    Okay.  Do you recall, even though he went over it in the

4    way you're talking about, did he talk about that part of a plea

5    agreement is that you waive your rights to appeal; did that --

6    did that come up in that discussion?

7    A    Not -- not that I can remember.  He said something about a

8    gun and something about -- I don't know if he -- if you know

9    what I'm talking about.  But he said:  The only thing that

10   this -- this plea agreement has been different from the one he

11   told me about is that something about a gun revised or

12   something.  And that's it.  He mentioned a gun being revised.

13   I never understood that, what he meant about that.  But

14   after -- from doing research on myself, my case, I come to find

15   out that that means that I get charged with the gun anyway.

16   So...

17   Q    Okay.  Let me see if I can -- do you know that part of the

18   plea agreement, whether it's from your discussions with

19   Mr. Nishimura or actually being at that hearing downstairs, you

20   know that part of it is that I could have charged you with

21   another offense that I did not charge you with, that I was

22   foregoing the opportunity to charge you with another offense,

23   did you understand that?

24   A    You mean the gun charge?

25   Q    Yeah.  But it's a particular type of gun charge called a

1    924(c), do you ever recall those numbers being talked about

2    with Mr. Nishimura?

3    A    Not really, no.

4    Q    Okay.  Do you recall reading his declaration --

5    A    He said something about the gun charge, I was going to be

6    dropped and that was that.  And I was going to plead guilty to

7    the drug charge.  And then on the day of -- of April 5th, he

8    said, this his exact words:  Okay.  This is the plea agreement

9    and it's been revised, something about a gun.  And that was

10   that.  And then after that, everything, I come to find out that

11   the gun charge I get charged with the guns anyway.  I get

12   enhanced and all that.  So I don't even understand all that.

13   Q    And when you say you get charged with the gun, you mean

14   there's going to be a firearm enhancement anyway on your

15   drug --

16   A    I guess so, yes.

17   Q    Okay.  Have you ever understood through your conversations

18   with Mr. Nishimura that the charges that I didn't bring against

19   you is a mandatory consecutive 5 years on top of the drug

20   calculation, did you ever talk about that?

21   A    I understand -- I understand what you're saying.  In --

22   being in the position I am right now, I am willing -- and I

23   spoke to my attorney about this -- I am willing through my

24   attorney to plead guilty to the drug charge, the gun charge and

25   to plead guilty to the superseding indictment pertaining to the

1    gun and -- the gun charge.  I am willing to do that right now

2    as long as I reserve my rights to appeal.  I just want to get

3    this over with and move on.

4    Q    Now, you mention that you -- you were obviously here when

5    we went through the Motion to Suppress.  You testified during

6    the Motion to Suppress --

7    A    Yeah.  Right here.  Right here.

8    Q    Is that right?  You remember that?

9    A    Yeah, right here on this -- yeah.

10    Q    And you also had an opportunity to read the judge's order

11    having to do with that -- denying that Motion to Suppress?

12    A    Yeah, I read that.

13    Q    Do you recall the specific portions of the judge's order

14    having to do with who he believed, the police officers and you,

15    who he believed in hearing testimony in that case?

16    A    Yeah, I read that.

17    Q    Who -- what did he think about the Maui police officers'

18    version of the events?

19    A    That he found them more credible -- more credible than me.

20    Q    And did he also say specific things about your credibility

21    as he was able to appreciate it during the hearing in that

22    order?

23    A    I can't really -- no.

24    Q    You don't remember?

25    A    Not exactly.

```
 1              MR. PORTER:  May I have one moment, Your Honor?

 2              THE COURT:  Yes.

 3                     (Pause in the proceedings.)

 4    BY MR. PORTER:

 5    Q    Do you recall if he said "the defendant's version of the

 6    events is not credible, it defies logic and the typical

 7    patterns of human behavior"; do you remember that part of the

 8    order?

 9    A    Yeah, I -- I remember that part, reading that part.

10    Q    How about another part that says "defendant's factual

11    scenario, I find it to be wholly unbelievable and the defendant

12    clearly abandoned the backpack"; do you recall that part?

13    A    I remember that part, reading that part.

14    Q    Okay.  Did you have any discussions with Mr. Nishimura

15    about -- you said that you talked about your appeal, did you

16    have discussions about when the denial of the suppression is

17    based on credibility, the likelihood of a successful appeal?  I

18    know that's a complicated question.

19    A    Yeah.

20    Q    You want me to rephrase?

21    A    All I know is this, Mr. Wes Porter:  Alvin told me some

22    stuff and I really didn't understand or comprehend everything

23    he was trying to tell me.  Like I said, with all due respect to

24    you and this court, that's my position.  I just want to get

25    this over with.  I want to reserve my rights to appeal.  I
```

1    believe it's my right.  And I took some bad advice and

2    that's -- that's where I'm at.

3    Q    Okay.  I only got one -- one --

4    A    I can't -- I can't be, you know, tricked into saying

5    something that might get me perj'd because whatever I said on

6    record that day is what I said.  I did say a lot of yeses.  I

7    did say a few nos.  And I just made a mistake.  I took bad

8    advice and that's -- I really believe that.

9    Q    Not talking about your answers that day in court, but do

10   you recall that when we were here downstairs, I was at that

11   hearing when you changed your plea, right?

12   A    Yes.

13   Q    And one of the things that we have to do during that

14   hearing is the court turns to me and they say:  Mr. Prosecutor,

15   can you summarize the provisions of the plea agreement; do you

16   remember that?

17   A    I think I remember the judge asking you something or

18   something like that.

19   Q    Okay.  And do you remember there's a point in time when I

20   pick up the piece of paper and I go through on paragraph such

21   and such and on page such and such this is what the agreement

22   says; you remember that?

23   A    Yes, I remember that.

24   Q    And do you remember whether I talked about a provision of

25   that plea agreement that says, while the defendant ordinarily

1   has a right to appeal, by entering his guilty plea here today

2   he waives that right to appeal except in two limited instances;

3   do you recall that?

4   A   I don't recall you saying something like that.

5   Q   Okay.  After I was done giving my version of the essential

6   terms of the plea agreement, do you recall that the judge then

7   went over some of the parts of the plea agreement?

8   A   Right.  He asked me if I understood this and I understood

9   that, and I said yeah.

10          THE COURT:  By the way, I think it was Judge Chang and

11   not Judge Kurren.

12          THE WITNESS:  Yeah, all right.

13   BY MR. PORTER:

14   Q   And do you recall that the magistrate judge after I was

15   done also asked you things about do you understand you're

16   waiving your right to appeal; do you recall that from the

17   hearing itself?

18   A   Yeah.

19   Q   Okay.

20          MR. PORTER:  Your Honor, I don't have any further

21   questions right now.

22          MR. ZENGER:  Your Honor, thank you for correcting the

23   record and I'd just like the record to reflect that any

24   questions where I had Judge Kurren I meant Judge Chang.  And I

25   apologize.

```
 1              THE COURT:  I understand.  Do you have anything else?
 2              MR. ZENGER:  No, Your Honor.
 3              THE COURT:  You may step down.
 4              THE WITNESS:  Thank you, sir.
 5                                      (Witness excused)
 6              THE COURT:  Do you have any other witnesses?
 7              MR. ZENGER:  No, Your Honor.
 8              MR. PORTER:  I don't have any witnesses, Your Honor.
 9              THE COURT:  All right.  Now, we have the affidavit of
10   Mr. Nishimura, but that isn't good enough.  He has to be made
11   available for cross-examination.  Do you wish to cross-examine
12   Mr. Nishimura on his affidavit?
13              MR. ZENGER:  Could I have a moment, Your Honor?
14              THE COURT:  Yes.
15              The record should reflect that counsel is conferring
16   with his client.
17              MR. ZENGER:  Your Honor, and you can ask the defendant
18   about this, I did speak to him about this earlier and again, we
19   would submit on Mr. Nishimura's affidavit.
20              THE COURT:  All right.  You understand, Mr. Kosi, that
21   you have the right to have Mr. Nishimura brought here and you
22   have the right to have your counsel question him under oath.
23   You understand that?
24              THE DEFENDANT:  Excuse me, Your Honor.
25              THE COURT:  Yes.
```

```
 1                    (Counsel and client conferring.)
 2              MR. ZENGER:  Your Honor, he's getting some hesitation.
 3    So, you know, I'm reluctant to waive the right to
 4    cross-examine.
 5              THE COURT:  No, you don't have -- you can't waive the
 6    right.
 7              MR. PORTER:  May I have one moment just to confer with
 8    counsel?
 9              THE COURT:  Yeah.
10                    (Counsel conferring.)
11              THE COURT:  Well, you either want him or you don't
12    want him to come here.
13              MR. ZENGER:  I understand, Your Honor.  We want him.
14              THE COURT:  You do.  All right.  Now, you understand
15    if he's called, that you will be waiving the attorney-client
16    privilege and he will be in a position to testify about what
17    you and he discussed.  You cannot have him come here and then
18    assert the attorney-client privilege if you're the one that's
19    asking him to show up and be cross-examined and examined.
20                    (Counsel and client conferring.)
21              THE COURT:  Do you want to think about it for about
22    5 minutes, you want a short recess?
23              MR. ZENGER:  Yes, Your Honor.  Thank you.
24              THE COURT:  All right.  All right.  Can you fellows
25    take him downstairs and he can talk to his lawyer down there
```

1    and then they'll bring him back up.  All right.  Give him about

2    15 minutes, all right?

3            MR. ZENGER:  Yes, Your Honor.

4            THE COURT:  Okay.  Why don't you go downstairs and

5    chat with him down there.  You can leave your stuff here, Mr.

6    Zenger, if you like.

7            MR. ZENGER:  Okay.

8            THE COURT:  I'm not going anywhere.

9            MR. ZENGER:  Okay.

10           THE COURT:  Just let him go down there -- see, we

11   can't -- actually, there's a space back here, isn't there,

12   Jeff?

13           THE DEPUTY MARSHAL:  We don't have a key for it,

14   though.

15           THE COURT:  Oh, you don't have a key?  Well -- huh?

16           MR. ZENGER:  It's okay with me if it's okay with the

17   court.  I can talk to him --

18           THE DEFENDANT:  Just a couple minutes.

19           THE COURT:  Can one of the marshals stay over there,

20   is that a problem?

21           Okay.  All right.  Just so you can have privacy from

22   the prosecutor.

23           MR. ZENGER:  5 minutes is all we need, Your Honor.

24           THE COURT:  All right.

25           (A recess was taken from 9:27 a.m. to 9:29 a.m.)

1        MR. ZENGER:  Your Honor, for the record, I believe

2    that Mr. Kosi has already, by the way he's testified, waived

3    his attorney-client privilege anyway.

4        THE COURT:  Well, I understand that, but I wanted to

5    make it very clear to him, he's a layman, that he may have said

6    things to Mr. Nishimura that Mr. -- he would not want to be

7    heard --

8        MR. ZENGER:  Yes, Your Honor.

9        THE COURT:  -- on the record and that they may be.

10   So...

11       MR. ZENGER:  And we have -- we reviewed carefully

12   Alvin Nishimura's affidavit and after having thought about what

13   was testified here today, I believe Mr. Kosi is willing to

14   waive his right to call -- to have me cross-examine

15   Mr. Nishimura and we're prepared to argue on the evidence

16   before the court.

17       THE COURT:  All right.  Is that right, Mr. Kosi?

18       THE DEFENDANT:  Yes, Your Honor.

19       THE COURT:  Okay.  And nobody has coerced you into

20   this?  You understand that you do have the right to have him

21   called.

22       THE DEFENDANT:  I understand everything clearly this

23   time, sir, yeah.

24       THE COURT:  All right.  All right.  So, we can proceed

25   then.  So you may argue.

1          MR. ZENGER:  Okay, Your Honor.  Your Honor, we've

2     submitted a memorandum and the government submitted a counter

3     memorandum and we'll submit on that.  I'm not going to

4     regurgitate what's said in there.

5          Our view of the law is that he need only show he

6     received bad advice, didn't get enough time to review it and it

7     wasn't a knowing, intelligent waiver at this stage of the

8     proceeding prior to sentencing.  It's uncontroverted, I believe

9     at this point, even if you looked at the affidavit of Al

10    Nishimura, that 10 minutes prior to him going -- Mr. Kosi going

11    in front of Judge Chang and --

12          THE COURT:  Does the affidavit say 10 minutes?

13          MR. ZENGER:  No, his -- I'm sorry, Your Honor.  His

14    affidavit is unclear.  It's Paragraph 14 of his affidavit says

15    he showed it to him before.  The only testimony the court has

16    before it is the testimony of Mr. Kosi that he came 10 minutes

17    downstairs and showed it to him through the mesh wire, as is in

18    my declaration, which is what Mr. Kosi's story has been to me

19    all along.  There's nothing to controvert that.  If you review

20    Attorney Nishimura's affidavit, it simply says I showed it to

21    him before, but he doesn't say when.

22          And so on that basis we would say there's no evidence

23    to controvert that it was 10 minutes through the wire mesh

24    downstairs that he saw the Memorandum of Plea Agreement first.

25    That's simply not enough time to go through it and have him

1  knowingly and intelligently and voluntarily waive his right to

2  appeal and understand everything that's in that long document.

3      And on that basis alone, Your Honor, and there's more

4  than that, but -- and coupled with the fact that from the very

5  beginning Mr. Kosi has continued at all times to say that it

6  was an unconstitutional search, it's uncontroverted, he still

7  believes it was.  Again, with all due respect to the court, he

8  disputes your findings and he would like the Ninth Circuit to

9  look at it.  And he's even willing to, like, bite the bullet

10  down an extra 4 or 5 years on a consecutive, risk that, in

11  order to have that right to appeal, and I think that's pretty

12  compelling evidence, Your Honor.

13      MR. PORTER:  Your Honor, the government -- the

14  government took a long time in assembling its opposition and

15  putting all the relevant facts together in there.  So I don't

16  want to spend too much time above and beyond that.

17      I would note that Paragraph 14 of Mr. Nishimura's

18  declaration says, "I went over the plea agreement with Kosi

19  before the change of plea hearing on April 5th."  You know,

20  without him here I can't flush out whether it was 10 minutes or

21  the day before or what.  But the most important part later on

22  in that Paragraph 14 is that "Kosi understood the provisions of

23  the plea agreement, including the appeals waiver."  And I think

24  even on the stand during my questions, you know, he remembers

25  those being covered during the change of plea hearing.

1          And I think there are some things in this case and

2     they're set out in my opposition that I think speak to this.

3     The fact that, you know, this motion comes, you know, really on

4     the eve of sentencing, several days before what was to be his

5     sentencing date, you know, a year after his change of plea,

6     after he has the benefit of seeing a presentence report with

7     all the calculations laid out, after he has the benefit of

8     understanding that the government has no grounds to bring a

9     downward departure motion before the court based on substantial

10    assistance to the United States, I think what it is, and this

11    is the typical way that these type of motions come to the

12    court, you know, it's second-guessing.  It's after the fact, we

13    look at how this thing has all turned out and we want to say

14    wow, if I had a chance to do it all over again I would

15    reorganize my plea in the following way.

16         And I do agree with Mr. Zenger that, you know, is it

17    compelling that he says that even the charge that I have

18    foregone in all of this and the benefit that he received under

19    that plea agreement, at least as the government perceives it,

20    that he's willing to plead guilty to that charge in

21    reorganizing his plea, that is compelling.  I'm not his

22    attorney, but I can -- I was -- you know, I was here during the

23    Motion to Suppress, I also heard the testimony, I have the

24    benefit of understanding the court's order and reading the

25    court's order and knowing what it's based upon.  I also have

1    the benefit of seeing similar matters go up on appeal and how

2    such matters are handled on appeal.  And it may be that the

3    most fair thing we can do and the thing that we can do to

4    benefit Mr. Kosi is not have him eat four additional years for

5    what amounts to just not a viable appellate issue.  And it's

6    difficult to say that, particularly in my shoes, on my side of

7    the courtroom, but the idea that he's willing to -- to go

8    through consecutive and add to his sentence really for nothing,

9    because the court knows as well as government counsel having

10   sat with the Ninth Circuit and having considered these type of

11   motions and these type of appellate issues, denial of

12   suppression motions on appeal, when it's so rooted in

13   credibility determinations based on the testimony heard by the

14   district court during that suppression motion, there's -- the

15   appellate court's hands are all but tied.  And I submit to the

16   court that, you know, even the legal issues in this case having

17   to do with a, you know, a car chase and a clear abandonment of

18   a backpack and then, you know, finding the backpack and seeing

19   dope, guns and Mr. Kosi's I.D. in that bag, the whole case, for

20   lack of a better term, wrapped up in a backpack, there's just

21   nothing there.

22          And that's why I think it's important, it's truly a

23   decision that's within the court's discretion, there's no doubt

24   about that, but it appears from the cases that have fallen on

25   the side of the district court allowing the defendant to

1   withdraw his guilty plea, particularly at such a late date, on

2   the eve of sentencing, it's because there's something new.

3   There's new evidence that's come up, the defendant has an

4   assertion of innocence, the first prong under the test, he has

5   looked at it and says:  Now this is a reason I need to go to

6   trial.  The cases that there are co-defendants involved and the

7   co-defendants go to trial and they're all found not guilty.

8   Well, maybe I should withdraw my plea and assert my innocence.

9   It's just not what Mr. Kosi is asking to do here today.  He's

10  asking to reorganize.  He's asking to let me withdraw my guilty

11  plea, Your Honor, and plead guilty again downstairs the same

12  day.

13          THE COURT:  I think I understand the government's

14  position.

15          MR. PORTER:  So, that's our position.  Thank you, Your

16  Honor.

17          THE COURT:  All right.

18          MR. ZENGER:  If I might briefly reply to two points,

19  Your Honor, if I might.

20          First is that while I can appreciate Mr. Nishimura's

21  gratuitous statements about what Mr. Kosi understood and didn't

22  understand, as the court well knows it's well impossible to

23  read the thoughts of another human being.  He may think that

24  Mr. Kosi understood, he may opine that Mr. Kosi understood, but

25  he certainly cannot actually tell us what's in Mr. Kosi's head

1   only he can do that, and subject to cross-examination as he was

2   today.

3          The other thing is that there's been absolutely no

4   evidence in this case that Mr. Kosi even read his PSI and saw

5   the guidelines before he actually asked me to withdraw --

6   actually asked me to structure the motion before the court.  No

7   one asked him that question.  So I think you might be able to

8   infer it, but it's not before the court.

9          THE COURT:  All right.  Well, first of all, let me say

10  that of all the judges certainly in our district, I am clearly

11  the one who is the most receptive to permitting a defendant to

12  withdraw their guilty plea.  I think at least from my

13  understanding of the rulings around here.  And that is

14  principally because of my view of the importance of the

15  constitutional right to a jury trial in a criminal case.

16         I remember quite well a situation several years ago, I

17  think it's been over a decade now, where a woman who was

18  charged with murder of her husband on a military reservation

19  had pled guilty to manslaughter and I knew that if I granted

20  her request to withdraw the guilty plea I would be facing what

21  was going to be a very nasty and probably a very lengthy jury

22  trial.  And I probably could have and easily could have denied

23  the request because her reasons were not that compelling.

24         In that case I granted the request.  We had a four to

25  five-week jury trial and the jury convicted her of

1   manslaughter, the same exact thing that she had pled guilty to.

2   But she had her right to a jury trial.

3         In this case Mr. Kosi has gone through three lawyers

4   whom he's had disagreements with.  He's now on his fourth

5   lawyer.  The affidavit of Mr. Nishimura makes it clear to the

6   court that Mr. Kosi was in fact provided with a review of the

7   plea agreement.  His version of it is not consistent with

8   Mr. Nishimura's, even though the time frame is different, it

9   really doesn't make any difference whether it was 2 days before

10  or 20 minutes before the hearing, as long as Mr. Nishimura had

11  an opportunity to go over it with him and Mr. Kosi understood.

12        Now, one of the things the court takes into careful

13  consideration is the court's perception of the intelligence and

14  ability to understand of the defendant.  It was one of the

15  concerns I had in the July case that I withdrew the -- allowed

16  the withdrawal of the guilty plea because I was concerned about

17  the woman's acuity and emotional status and her ability to

18  truly perceive what was going on.

19        Mr. Kosi, on the other hand, is a very cool and

20  calculating individual.  He's very intelligent.  He is quite

21  well spoken.  He understands precisely what he is saying and

22  what he is doing.  He was under no pressure of any kind and he

23  made what was, and I think the court has to take this into

24  consideration as well, a decision based upon legal advice that

25  I can only suggest was sound.

1          We don't have a situation in this case where there was

2      a huge conflict in -- in testimony.  I mean we had the

3      defendant saying one thing and we had several other people

4      saying something precisely opposite.  This is not a case where

5      we had three or four eyewitnesses and two or three of them

6      supported the defendant and two or three of them didn't and it

7      was a close call and who do I believe.  The evidence was just

8      very clear to the court.

9          Secondly, we had no novel or interesting or

10     cutting-edge legal issues in this case at all.  None.  We had a

11     situation here where the law was very clear.  If one set of

12     facts was correct, the motion would be granted and the evidence

13     suppressed.  If another set was correct, the evidence would not

14     be suppressed.  And the court found clearly and unequivocally

15     based upon a credibility determination that the set that did

16     not favor suppressing the evidence was the correct set of

17     facts.

18         Now, unless the Ninth Circuit Court of Appeals -- and

19     I never really decide these cases based upon what I think the

20     Court of Appeals will or will not do -- but unless the Court of

21     Appeals in this case were to step out of its role as an

22     appellate court and become a trial court, retrying the

23     credibility of the witnesses, something that the good judges of

24     the Ninth Circuit don't do on a regular basis, I hope, and I

25     understand and I know, I -- I can't see that this is a motion

1    that a lawyer would tell his client had a high chance of

2    success or even a debatable chance of success.  So I can't --

3    and I only look at that in the sense that I look at what

4    Mr. Nishimura might have advised this defendant and how he

5    would have looked at it.  It was not a situation where he took

6    bad advice.  I mean the advice seems to me to be quite sound.

7            And then I have to look back and determine whether in

8    fact there's anything in the record that makes it clear to the

9    court that the defendant truly did understand his rights.  And

10   all I have to do is really look at the record in this case and

11   I look at Page 9 of the transcript.  And on Page 9 of the

12   transcript of the change of plea, not only did previously the

13   prosecutor in this case explain on the record that there was a

14   waiver of appeal, so the defendant heard it at that time, the

15   judge then did precisely what any good federal judge would do,

16   because the waiver of appeal is so important, the judge just

17   didn't simply say:  Well, you understand everything the

18   prosecutor said?  Fine.  The judge reiterated to the defendant,

19   and let me read it.

20           Here's from the court:  "Do you understand that you

21   are waiving, or giving up" -- he doesn't even take a chance

22   that he doesn't understand the word "waive" -- "waiving or

23   giving up all, all of your rights to appeal except for two

24   situations.  First, if Judge Ezra imposes a sentence above the

25   advisory sentencing guideline; and secondly, in the -- in the

1    event of ineffective assistance of counsel."

2              "The Defendant:  Yes, Your Honor."

3              No question about it.

4              Now, if all of this had happened and then the

5    defendant had turned around within weeks, a few weeks and said:

6    You know, I know what I said on the record but now that I've

7    thought about it and I've looked at it, I'm really concerned

8    about this.  I really was bedazzled and befuddled at the

9    hearing and I really wanted to appeal this suppression motion,

10   and -- and then the motion was filed to set it aside, I think

11   there would be a significantly greater chance that the court

12   would find that a credible argument.  But if you look at the

13   date on the change of plea, it is April the 5th, 2005.  This is

14   April the 7th, 2006.  The defendant waited, because he brought

15   this up at his sentencing, which was how long ago, about a

16   month ago?

17             MR. PORTER:  Couple weeks.

18             THE COURT:  Couple weeks ago.  All right.  He waited

19   almost a year, 12 months to raise the issue of his alleged

20   misunderstanding.

21             Now, as I said, the court is generally quite lenient,

22   but it is also extremely important that the court enforce the

23   rules and the integrity of the process.  We cannot have it that

24   defendants understand that they can enter into plea agreements

25   with the government, in this case quite a favorable plea

1    agreement for the defendant by the way, and then wait until the

2    last minute after they've had a chance to really get a fix on

3    the thought of the particular sentence they're going receive,

4    and say:  Well, the jig is up, I'm changing my plea.

5        Now, why -- why is that not good?  Well, first of all,

6    it disturbs the finality of the process.  Secondly, it makes a

7    mockery of the entire Rule 11 process.  Thirdly, it is

8    inherently unfair to the government.  Because if defendants get

9    the understanding or have the right to play that kind of a

10   game, during that 6 months or a year, and I don't know why it

11   was a year until sentencing in this case, it must have been

12   something -- oh, he went through a whole bunch of lawyers.

13       MR. PORTER:  I think there were Booker-related issues

14   as well.

15       THE COURT:  Oh, yeah, there were Booker issues.  The

16   defendant would have the time, if he wished to, to stall off

17   until witnesses either died, lost or, you know, couldn't be

18   found and agents are transferred, the case becomes stale, then

19   all of a sudden well, now I'm ready to go to trial.  And we

20   can't have that.  That's unfair.

21       Now, the court believes very much in the rule of

22   lenity.  Rule of lenity in a criminal case suggests that in

23   every opportunity where it is a close or debatable call, the

24   court always falls on the side of the defendant.  And I -- Mr.

25   Porter has been the recipient of the court's rule of lenity

1    more than once where the court has ruled against him where I

2    think that I, you know, had I not applied the rule of lenity I

3    might have ruled for him.

4         But in this case the rule of lenity simply doesn't

5    apply.  Because it isn't even a close call as far as this court

6    is concerned, even given my proclivity to grant these motions,

7    because the record is absolutely clear to the court that the

8    defendant made a knowing and informed decision to enter into

9    the plea agreement.  He did so with the advice of very

10   competent counsel.  There is -- there were no genuinely

11   debatable issues for which the court would say well, you know,

12   okay, let's let this go up because we've got some kind of a new

13   twist on Booker and Fanfan, or we've got some interesting novel

14   issue.

15        And by the way, this court has no problem, people said

16   with all deference to Judge Ezra we want to appeal.  Nobody has

17   to give me any deference.  I don't have any problem with people

18   appealing my rulings, the government or the -- or the

19   defendant.  I've had lawyers appeal me who were -- I ruled

20   against who were very close friends of mine over the years.

21   And in one or two cases they've gotten me reversed in

22   complicated cases.  In one case the law changed after I had

23   ruled and I ended up getting reversed.  Do I have -- do I hold

24   it against -- absolutely not.  That's the way lawyers operate.

25   When I was a lawyer I appealed the federal judges and I had

1   them reversed on a couple of occasions.  Judge Pence notably,

2   who was my mentor, I got him reversed in a big case and he and

3   I were still very good friends.  That's the way we operate.

4   It's the name of the game.

5        I mean I get reversed by Ninth Circuit judges who are

6   my very good friends.  They reverse me on occasion.  Do I hold

7   it against them?  Absolutely not.  That's their job.  I would

8   hold it against them if they affirmed me in cases where I

9   should be reversed because of our friendship.  That would be a

10  terrible thing.  I respect them for doing what they believe is

11  right.  Doesn't mean I agree with them, but I respect them for

12  doing what they think is right.

13       In this case there's just no question that looking at

14  this from every angle, giving every benefit to the defendant,

15  there simply isn't a basis here upon which to allow him to in

16  any way withdraw his guilty plea.

17       So, I am going to deny the motion to withdraw his

18  guilty plea.  I will file a written order but -- which will

19  also incorporate what I have said here today as part of my

20  order.  I don't believe I'll repeat it, but I will put a

21  written order in.  So...

22       And I don't know how it works.  I don't know whether

23  you can appeal, if you said you're not going to appeal, I don't

24  know whether you can appeal a Motion to Withdraw Guilty Plea,

25  but I guess you can.  I think you can.  I think he does have

1    the right to appeal.  So you will get to see the Ninth Circuit.

2    You get to appeal my denial of your motion to withdraw.  And

3    you'll have to appeal that, I think, within 10 days of the

4    entry of judgment in this case.  You understand?

5              THE DEFENDANT:  (Nods head up and down).

·6              THE COURT:  So you -- you won't have the right to

7    appeal right away the suppression, but you will have the right

8    to appeal my order denying your motion to withdraw your guilty

9    plea.  And if that is sustained on appeal, then you get to

10   start all over again.  Okay?

11             I don't know whether you want to start all over again,

12   but you get to start all over again, okay?

13             It's not for me to decide what is a smart thing for

14   you to do.  And I'm not ruling based upon the government's

15   suggestion that the kindest thing I could do is turn you down

16   because you'll just end up with four extra years.  That's not

17   for me to decide, that's for you to decide.  If you want to

18   take that opportunity and that chance, that's certainly your,

19   as we say in Hawaii, kuleana.  Right?  You know what that

20   means, right?

21             THE DEFENDANT:  (Nods head up and down).

22             THE COURT:  Okay.  For the judges of the Ninth Circuit

23   who may read this transcript, kuleana means that's your

24   business.  Unless we happen to get Judge Clifton.  Or one of

25   our friends from the Ninth Circuit who's spent a lot of time

1    here and understands the Hawaii terms.

2            Okay.  So we will proceed now to sentencing, not

3    today, we will set a new sentencing date.  We will have your

4    sentencing.  At the end of the sentencing I will advise you

5    that you don't have the right to appeal the sentence, but you

6    will have the right to appeal my denial of your motion to grant

7    you the opportunity to withdraw your guilty plea.  Okay?  You

8    understand?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  All right.  Okay.  All right.  The court

11   stands in recess.

12           MR. ZENGER:  Thank you, Your Honor.

13           (The proceedings concluded at 9:54 a.m., April 7,

14   2006.)

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4     States District Court, District of Hawaii, Honolulu, Hawaii, do

5     hereby certify that the foregoing pages numbered 1 through 36

6     is a correct transcript of the proceedings had in connection

7     with the above-entitled matter.

8

           DATED at Honolulu, Hawaii, September 22, 2006.

9

10

                         /s/ Cynthia Fazio
11                       CYNTHIA FAZIO, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25